Filed 5/23/24  In re J.W. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re J.W., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>J.W.,<br><br>        Defendant and Appellant. | A164366<br><br>(San Francisco City & County Super. Ct. No. JW196215) |

J.W. appeals from orders of the juvenile court finding he committed first degree murder and attempted murder and committing him to a secure youth treatment facility (SYTF) for a time not to exceed his 25th birthday. Appellant asserts numerous grounds for the reversal of the court's orders. We affirm in part and reverse in part.

**BACKGROUND**

The San Francisco District Attorney filed a wardship petition (Welf. & Inst. Code, § 602), alleging that on September 8, 2019, appellant, then age 17, committed murder (Pen. Code,[1] § 187, subd. (a)), with a lying-in-wait

_____

[1] All further undesignated statutory references are to the Penal Code.

1

allegation (§ 190.2, subd. (a)(15) [count I]), attempted murder with an allegation of premeditation and deliberation (§§ 187, subd. (a), 664 [count II]), assault with a semiautomatic firearm (§ 245, subd. (b) [count III]), two counts of carrying a loaded firearm (§ 25850, subd. (a) [counts IV & V]), carrying a concealed firearm in a vehicle (§ 25400, subd. (a)(1) [count VI]); and two counts of possession of a firearm by a minor (§ 29610) [counts VII & VIII]). With respect to the first three charges, the petition alleged appellant was armed with and personally and intentionally used a firearm, and inflicted great bodily injury. (§§ 12022, subd. (a)(1), 12022.5, subd. (a), 12022.7, subd. (a), 12022.53, subds. (c)-(d).)  All offenses were alleged to have been committed on September 9, 2019, with the exception of count VIII, which was alleged to have been committed on September 25, 2019.

The following evidence was admitted at the contested jurisdictional hearing, which took place over the course of 14 days:

On September 2, 2014, appellant's older brother R.W. was fatally stabbed outside a liquor store in San Francisco.  Appellant, then age 12, witnessed the stabbing; appellant identified Luis Q. as the perpetrator.  Luis was arrested and charged with causing R.W.'s death.  However, several months later, the district attorney's office dropped the charges.

On September 8, 2019, surveillance video recovered from the Bay Bridge Toll Plaza captured appellant driving his mother's 2005 Acura TL through the westbound toll lane at 7:56 p.m.  On that day, Luis and his girlfriend, A.B., had been helping A.B.'s mother with a residential move within the Excelsior District.  They used a moving van and Luis's car to make multiple trips between the two residences; they finished sometime between 8:00 p.m. to 9:00 p.m.  Luis and A.B. were then going to meet A.B.'s mother at a restaurant in Glen Park.

2

Video footage retrieved from France Street, shows an Acura TL traveling past the moving van used by Luis and A.B. more than once. The Acura TL (the Acura), had characteristics consistent with model years 2004 to 2008: two side marker lights (one on the front fender just below the right passenger side mirror and a second on the upper rear quarter panel); a bodyline (that ran from the front passenger side along the front side marker to the front passenger door handle, to the rear passenger door handle, and connected to the rear quarter panel side marker light); and five-spoke wheel rims.

Video footage captured an Acura following Luis's car to a gas station located at Geneva Avenue and Naples Street. The driver double-parked the Acura, activated its hazard lights, and waited near the intersection of Naples Street and Geneva Avenue while Luis inflated his car's tires at the gas station.

Additional surveillance footage, shows the Acura following Luis's car as it drove away from the gas station, turned right onto Athens Street, and stopped on a residential street. A few seconds later, the driver parked the Acura a short distance behind Luis's car, ran to the driver's side door of Luis's car, and fired 21 rounds from an FN Five-Seven semiautomatic pistol into the car, killing Luis and injuring A.B. The surveillance video shows the shooting occurring at 9:06 p.m.

Shortly thereafter at 9:19 p.m., a license plate reader and surveillance video captured appellant in his mother's Acura traveling east on the Bay Bridge near Treasure Island. The time to drive to that location from the crime scene was approximately nine minutes.

A.B. observed the male shooter's eyes when they were illuminated by the muzzle flash. The shape of the shooter's eyes was similar to the shape of

3

appellant's eyes. A.B. called 911. She told the operator she did not know the identity of the shooter. She later described the shooter as a "light-skinned" Hispanic male. Appellant was a "mixed race" male, with a "light comple[xion]."

Responding officers collected 21 cartridge casings from the scene, all of which were 5.7-caliber. Forensic testing revealed the cartridge casings were fired from the same firearm—an FN Five-Seven semiautomatic handgun.

An FN Five-Seven semiautomatic handgun has a capacity of 21 rounds, consisting of 20 rounds in the magazine plus one round in the chamber. It is considered to be a somewhat expensive and rare gun, due to its unique characteristics (including markings on the pistol grip and rear slide, the curvature of the pistol grip, the magazine style, and side switches).

On September 18, 2019, a video was posted to the Instagram account of Joey La Pierre (also known as Joe or Joey Vega), depicting appellant sitting next to what appeared to be an FN Five-Seven pistol in the rear passenger seat of a vehicle.

Police arrested appellant on September 25, 2019. Police found an operational and loaded nine-millimeter Glock handgun with a laser sight and extended magazine clip in a backpack in appellant's possession.

## DISCUSSION

### I. Motion for Mistrial

Appellant contends the court abused its discretion by denying a motion for mistrial based on the prosecution's failure to disclose all of A.B.'s prior statements and for failing to impose a "predetermined" sanction to exclude non-discovered witness statements. The People appear to concede the discovery violation, but maintain evidentiary sanctions were not required, and any error in denying the mistrial motion was harmless.

4

### A.  Additional Background

Prior to the jurisdiction hearing, the prosecution sought and obtained an order for the exclusion of "any evidence not previously discovered to the prosecution" and for discovery of any unrecorded oral statements of witnesses communicated to the defense.

On November 30, 2020, A.B. testified at the jurisdictional hearing as the sole percipient witness to the murder and attempted murder.  On direct examination, the only person she implicated as the shooter was Joey Vega. Then, for the first time on cross-examination, A.B. said she had made statements to the District Attorney's office suggesting that appellant could also be the shooter.

A.B. said she saw appellant at a January 10, 2020 pre-trial hearing, where she learned he was being charged in connection with Luis's murder. Defense counsel asked A.B., "At any time after being [at the January 10, 2020 hearing], and seeing [appellant] did you say to any policeman, . . . any District Attorney or anything, hey, that's the guy who did it?" A.B. answered, "Yes."  When asked whom she spoke to, A.B. responded, "To Maria and to whoever else I talked to in the DA's office.  I had many meetings with them. Even Chesa."  Defense counsel immediately requested a sidebar conference, which was denied.

Upon resuming cross-examination, defense counsel asked A.B., "There is nothing right now as you sit there looking at [appellant] that indicates that he could be the shooter," to which she responded, "The shape of his eyes." During redirect, A.B. testified that as it was dark outside, she had only been able to see the shooter's eyes during the flashes of light from the gunshots; she was not focused on the shooter, but had been focused on Luis and the unfolding events.

5

Defense counsel moved for a mistrial based on A.B.'s testimony about her prior statements, stating, "I never received any discovery of any report that was ever made of any memorandum," and concluding, "I think that I have been severely prejudiced by that. I have never been provided anything in discovery. I'm not ascribing fault to [the prosecutor] at all." The prosecutor responded he was unaware that A.B. had made any prior statements that appellant's eyes were "similar to the eyes of the shooter."

The trial court ordered the prosecutor to look into whether there was "any discovery regarding this conversation between Ms. Reynoso and [A.B.]" and "to turn that over" to the defense. The court denied the motion for a mistrial.

## B.    *Applicable Law*

Section 1054.1 requires the prosecutor in a criminal case to disclose certain information, including all "[r]elevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial." (§ 1054.1, subd. (f).) Discovery in juvenile delinquency cases is not governed by the discovery disclosure provisions of section 1054, et seq. (See *Robert S. v. Superior Court* (1992) 9 Cal.App.4th 1417, 1421–1422.) However, "discovery practice in delinquency proceedings generally has been derived from, and parallels, that in adult criminal cases." (*City of San Jose v. Superior Court* (1993) 5 Cal.4th 47, 54.) Discovery in juvenile delinquency proceedings is also guided by California Rules of Court, rule 5.546.[2] (*J.E. v. Superior Court* (2014) 223 Cal.App.4th 1329, 1334, fn. 5.)

---

[2] California Rules of Court, rule 5.546 provides, in part, as follows: "(a) General purpose [¶] This rule must be liberally construed in favor of informal disclosures, subject to the right of a party to show privilege or other good cause not to disclose specific material or information. [¶] (b) Duty to disclose police reports [¶] After filing the petition, petitioner must promptly

6

If the prosecutor fails to comply with the statutory disclosure requirements, the court "may make any order necessary to enforce [those provisions], including, but not limited to, immediate disclosure, contempt proceedings, delaying or prohibiting the testimony of a witness or the presentation of real evidence, continuance of the matter, or any other lawful order." (§ 1054.5, subd. (b); see *People v. Verdugo* (2010) 50 Cal.4th 263, 280.)

The court may exclude evidence "only if all other sanctions have been exhausted." (§ 1054.5, subd. (c).) And a mistrial should be granted only when " 'a party's chances of receiving a fair trial have been irreparably damaged.' " (*People v. Welch* (1999) 20 Cal.4th 701, 749.)

We review a court's ruling on discovery matters for abuse of discretion. (*People v. Ayala* (2000) 23 Cal.4th 225, 299.) This includes the court's denial of a motion for a mistrial based on the prosecutor's violation of the discovery statutes. (*Id.* at p. 282.)

## C.     *Analysis*

Appellant contends the court abused its discretion by denying the mistrial motion and for failing to execute the so-called predetermined sanction for discovery violations.[3] We disagree.

"We start with the basic 'judicially created' [citation] rule that *in limine* rulings are not binding because the trial court has the power to reconsider, modify or set aside its order at any time prior to the submission of the cause.

---

deliver to or make accessible for inspection and copying by the child and the parent or guardian, or their counsel, copies of the police, arrest, and crime reports relating to the pending matter. Privileged information may be omitted if notice of the omission is given simultaneously." (Bold face omitted.)

[3] We do not address the People's forfeiture argument; we instead proceed to the merits of appellant's claim and conclude it fails.

(*People v. Campa* (1984) 36 Cal.3d 870, 885–886 . . . .)" (*People v. Yarbrough* (1991) 227 Cal.App.3d 1650, 1655; see also *People v. Karis* (1986) 46 Cal.3d 612, 634, fn. 16 ["a ruling on a motion *in limine* is not generally binding on the trial court, which is free to reconsider its ruling at the time the challenged evidence is offered"].) Therefore, contrary to appellant's argument, the court was not "required to exclude the statements that pertained to those undisclosed communications in accordance with its pretrial order."

Instead, the court "reconsidered" its ruling and exercised its authority under section 1054.5 to "make any order necessary to enforce the provisions of this chapter, including, but not limited to, immediate disclosure . . ." and admonished the prosecution to turn over discovery regarding the conversation between the district attorney's office and A.B.

Turning to the issue of whether the trial court should have otherwise excluded the evidence, we find no abuse of discretion. In determining whether to exclude evidence that may affect the factfinding process, "the court must consider the extent to which exclusion of particular evidence may undermine the reliability of the fact finder's conclusion." (*People v. Gonzales* (1994) 22 Cal.App.4th 1744, 1757 (*Gonzales*).) The court should also consider the effectiveness of lesser sanctions, the impact of exclusion of evidence at trial and the outcome of the case, the extent of surprise and whether the violation was willful and designed to obtain a tactical advantage. (*Ibid.*) *Gonzales* recognized that preclusion might be ordered to address prejudice to the surprised party or to punish the offending party. It concluded that if the sanction is being imposed to address prejudice, "the prejudice would necessarily have to be substantial and irremediable," and the consequence to the truth-finding process would have to be balanced. (*Id.* at pp. 1757–1758.)

Where the purpose of the sanction is to punish the offending party, *Gonzales* concluded, "[A]bsent a showing of significant prejudice and willful conduct, exclusion of testimony is not appropriate as punishment." (*Id.* at p. 1758.)

Here, the record does not support any express or implied finding that the prosecutor's failure to disclose A.B.'s prior statements amounted to willful misconduct to obtain a tactical advantage. Indeed, defense counsel conceded there was no foul play by the prosecution. Accordingly, our focus is on whether appellant established the non-disclosure resulted in substantial and irremediable prejudice. (*Gonzales, supra*, 22 Cal.App.4th at pp. 1757–1758.)

Although defense counsel stated he had been "severely damaged" by the late disclosure, he made no attempt to specify what he would have done differently had A.B.'s statements been disclosed sooner. (See *People v. Verdugo, supra*, 50 Cal.4th at p. 283.) Appellant now suggests other actions that could have been taken had defense counsel received timely discovery of A.B.'s statements, including, "investigat[ing] the circumstances under which [A.B.] had made her observations, her location in the courtroom from which the observations were made, whether appellant had ever faced the spectators, the distance between them, the length of the observation and the conditions in the courtroom." However, had defense counsel desired to address these issues, he could have requested a continuance or posed additional questions to A.B., who was excused subject to recall. In the absence of a request for a continuance, "a claim that any surprise enhanced the damaging effect of [the witness's] testimony is speculative." (*People v. Arias* (1996) 13 Cal.4th 92, 151–152.)

We conclude the court did not abuse its discretion in denying appellant's request for evidentiary sanctions and a mistrial.

9

## II. Ineffective Assistance of Counsel

Appellant contends his counsel was ineffective at the jurisdiction hearing in several ways, primarily with respect to A.B.'s testimony, as well as by failing to produce evidence to support representations in opening statement, failing to object to other firearm evidence, and failing to argue the kill zone theory advocated by the prosecution was inapplicable.

"The due process right to effective assistance of counsel extends to minors in juvenile delinquency proceedings." (*In re M.V.* (2014) 225 Cal.App.4th 1495, 1528.) " 'In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome. [Citations.] A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy. Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel. [Citations.] If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. [Citation.] Otherwise, the claim is more appropriately raised in a petition for writ of habeas corpus.' " (*People v. Carter* (2005) 36 Cal.4th 1114, 1189.)

### A.    A.B.'s Testimony

Appellant argues his retained defense counsel rendered ineffective assistance by: (1) eliciting damaging testimony on cross-examination

regarding the shooter's identity and failing to move to strike it; (2) failing to request exclusion of the late-disclosed statements; and (3) failing to elicit testimony that A.B. took Luis in the opposite direction of Glen Park.

The extent of cross-examination is a classic tactical decision trial counsel must make. (*People v. Cleveland* (2004) 32 Cal.4th 704, 746 ["normally the decision to what extent and how to cross-examine witnesses comes within the wide range of tactical decisions competent counsel must make."].) Courts " ' have been "reluctant to second-guess counsel" [citation] where a tactical choice of questions led to the damaging testimony.' " (*Ibid.*) Here, a tactical choice readily appears. Faced with new information, defense counsel attempted to elicit testimony that A.B. saw appellant at an earlier court proceeding and that she had not identified him as the shooter to anyone on the prosecution team before the jurisdiction hearing. However, unbeknownst to both the defense and the prosecution, A.B. had previously made statements indicating that appellant could be the shooter. "Rigorous cross-examination risks eliciting damaging redirect examination. Whether to run that risk is a tactical choice counsel must be permitted to make. Moreover, here the damaging testimony came only from the same witness the defense necessarily was attempting to discredit." (*Ibid.*)

Contrary to appellant's assertion, there was no legal ground for striking A.B.'s testimony that appellant could be the shooter. (See *People v. Hovarter* (2008) 44 Cal.4th 983, 996 [there must be a "legal ground for exclusion of otherwise relevant evidence"].) "[R]elevant evidence shall not be excluded . . . in any trial or hearing of a juvenile for a criminal offense, whether heard in juvenile or adult court." (Cal. Const. art. I, § 28, subd. (f)(2).) Any motion to strike A.B.'s testimony would have been futile and nothing would have prevented the prosecution from presenting it on redirect

11

examination. (See *People v. Cudjo* (1993) 6 Cal.4th 585, 616 ["[b]ecause there was no sound legal basis for objection, counsel's failure to object to the admission of the evidence cannot establish ineffective assistance"]; *People v. Diaz* (1992) 3 Cal.4th 495, 562 [failure to object to admissible evidence does not constitute ineffective assistance of counsel because objection would have been futile].)

Equally unavailing is appellant's claim that defense counsel was ineffective for failing to request the exclusion of A.B.'s testimony as a discovery violation sanction. A claim of ineffective assistance of counsel based on a trial attorney's failure to make a motion must demonstrate not only the absence of a tactical reason for the omission, but also that the motion would have been meritorious. (*People v. Mattson* (1990) 50 Cal.3d 826, 876.) Here, as discussed, any motion to exclude A.B.'s testimony as a sanction for a discovery violation would have been denied. Thus, defense counsel was not ineffective for failing to make the motion. (*People v. Weaver* (2001) 26 Cal.4th 876, 931 ["Counsel is not ineffective for failing to make a frivolous motion"]; *People v. Torrez* (1995) 31 Cal.App.4th 1084, 1091 ["[C]ounsel is not required to make futile motions or to indulge in idle acts to appear competent"].)

Finally, appellant argues defense counsel rendered ineffective assistance by failing to argue that A.B. took Luis in the opposite direction from Glen Park, which put him in a position to be shot.[4] This argument hinges on appellant's unsupported theory that A.B. was in on the plan to kill Luis. Counsel's failure to argue this speculative theory can hardly be deemed

---

[4] Previously, we deferred taking judicial notice of the map of the area; in considering the merits of the appeal, we have taken judicial notice, without any determination of relevance, of the map.

ineffective. (See *People v. Williams* (1988) 44 Cal.3d 883, 933 ["A factual basis, not speculation, must be established before reversal of a judgment may be had on grounds of ineffective assistance of counsel."].)

## B. *Failure to Produce Evidence Supporting Opening Statement*

Appellant contends defense counsel was ineffective for failing to produce evidence to support his representations in opening statement, namely that cartridge casings tested positive for DNA for someone other than appellant. He further asserts defense counsel failed to impeach the investigating officer with stipulated evidence that appellant had been excluded as the contributor to DNA recovered from a spent casing.

The parties stipulated to the admission of two reports from the People's forensic DNA expert that summarized the 21 cartridge casings recovered at the crime scene and other firearms evidence. The reports indicated a DNA profile obtained from one of the cartridge casings from the crime scene was compared against reference samples provided by appellant and Vega, and both were excluded as the possible contributor. Subsequently, Sergeant Kasper testified on cross-examination that he was informed the cartridge casings at the crime scene were FN Five-Seven and that subsequent examination of the casings produced "negative results." On redirect examination, Sergeant Kasper testified that "negative results" meant "there was no DNA recovered" from the cartridge casings. During closing argument, defense counsel stated, "The DNA evidence speaks for itself."

The failure to impeach a witness is a matter that involves tactical decisions and seldom establishes an attorney's incompetence. (*People v. Frierson* (1979) 25 Cal.3d 142, 158.) Here, defense counsel could have reasonably construed Sergeant Kasper's testimony that the cartridge casings produced "negative results" to mean that the DNA testing results on the

13

casings did not incriminate appellant. Defense counsel also could have made a strategic decision to rely on the stipulated evidence of the DNA test results and his closing argument to address this issue. (See *People v. Johnsen* (2021) 10 Cal.5th 1116, 1165 [trial counsel may have strategically decided not to object to prosecutor's comments and instead rely on the counterarguments in his closing argument]; *People v. Bell* (2020) 48 Cal.App.5th 1, 23 [assuming testimony was inaccurate, defense counsel could have reasonably decided to wait and draw attention to it during closing argument].)

Appellant also argues defense counsel rendered constitutionally deficient performance by failing to introduce evidence that individuals at the crime scene described the suspect vehicle as a Lexus. "Forgoing the presentation of testimony or evidence promised in an opening statement can be a reasonable tactical decision, depending on the circumstances of the case." (*People v. Stanley* (2006) 39 Cal.4th 913, 955.)

Here, defense counsel could have reasonably decided that an initial report of the suspect vehicle as possibly being a Lexus carried much less weight than the lack of direct evidence connecting appellant to the crime scene. The record does not suggest counsel's performance was obviously inadequate, or that there could be no satisfactory explanation for his actions or omissions.

## C.     *Failure to Object to Firearm Evidence*

Appellant argues defense counsel rendered ineffective assistance of counsel related to the firearms evidence by failing to object that the gun in the Instagram post was "possessed" by appellant; failing to challenge the sufficiency of the evidence regarding gun possession; unjustifiably conceding the object in the Instagram post was an FN Five-Seven; and failing to object

14

to the "unsupported assumption" that the murder weapon was an FN Five-Seven.

Even when there is a basis for objection, " ' "[w]hether to object to inadmissible evidence is a tactical decision; because trial counsel's tactical decisions are accorded substantial deference [citations], failure to object seldom establishes counsel's incompetence." "In order to prevail on [an ineffective assistance of counsel] claim on direct appeal, the record must affirmatively disclose the lack of a rational tactical purpose for the challenged act or omission." ' " (*People v. Majors* (1998) 18 Cal.4th 385, 403.) Further, "[t]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." (*Strickland v. Washington* (1984) 466 U.S. 668, 689.)

Here, the record does not show that each claimed failure by defense counsel was without a rational tactical purpose. In summary, the court was presented with video surveillance that captured a shooter discharging 21 rounds in six seconds into the victim's vehicle, killing Luis and injuring A.B. Officers responded to the scene and collected 21 cartridge casings, all of which were 5.7-caliber. The cartridges were analyzed and found to be all fired from the same weapon—an FN Five-Seven semiautomatic handgun. Such a handgun has a capacity of 21 rounds, consisting of 20 rounds in the magazine plus one round in the chamber. Additionally, a video post to an Instagram account, ten days after the murder, depicted appellant in the backseat of a vehicle with an object on the seat right next to his leg.

The prosecution established that the object looked like an FN five-seven semi-automatic weapon. Specifically, Officer Ochoa testified that he recognized the type of firearm because he owned one and was able to describe the weapon's rare and unique characteristics.

15

Given the state of the evidence in this case, defense counsel could have made a rational, tactical decision not to object and instead rely on counterarguments in his closing suggesting that the object was put there by someone other than appellant and point out, as he did, that "[t]here is no indication that it was the weapon that was used in the homicide. None." (See *People v. Bell, supra,* 48 Cal.App.5th at p. 23) Ultimately, counsel made a reasonable, strategic decision to defend appellant in this manner and the record in this case does not preclude the possibility of a satisfactory explanation for said approach. Thus, appellant's claims of ineffective assistance of counsel must be rejected.

## D.    *Attempted Murder*

Appellant raises several claims that defense counsel rendered ineffective assistance by failing: (1) to argue the kill zone theory was inapplicable; (2) to object to the prosecution's reliance on facts not in evidence regarding the characteristics of the FN Five-Seven ammunition; (3) to argue the prosecution's argument was an implied theory of malice, and (4) to object to the "misstatement" that A.B. was in the direct line of fire. Appellant argues these omissions were prejudicial because there was no substantial evidence of attempted murder. As we explain in the next section, substantial evidence supports the attempted murder finding under a kill zone theory. Accordingly, any claimed error was harmless.

## E.    *Cumulative Prejudice*

Finally, appellant contends that even if harmless individually, the cumulative effect of the trial errors mandates reversal. "Cumulative error is present when the combined effect of the trial court's errors is prejudicial or harmful to the defendant." (*People v. Capers* (2019) 7 Cal.5th 989, 1017.) Here, we have not found multiple errors to aggregate. (See *People v. Bolin*

16

(1998) 18 Cal.4th 297, 335 [rejecting defendant's contention that "even if harmless individually, the cumulative effect of the trial errors mandates reversal," because "we have rejected all of his claims, we perforce reject this contention as well"].)

### III. Sufficiency of the Evidence Claims

Appellant challenges the sufficiency of the evidence supporting the findings that he was the shooter, committed premeditated attempted murder, and carried a concealed weapon in a vehicle.

### A.      *Identity of Shooter*

Our review must presume in support of the judgment the existence of every fact the trier of fact could reasonably have deduced from the evidence. (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)  Where, as here, the evidence of guilt is largely circumstantial, our task is not to resolve credibility issues or evidentiary conflicts, nor is it to inquire whether the evidence might reasonably be reconciled with the defendant's innocence.  (*Id.* at p. 92; *People v. Maury* (2003) 30 Cal.4th 342, 403.)  It is the duty of the trier of fact to acquit the defendant if it finds the circumstantial evidence is susceptible to two interpretations, one of which suggests guilt and the other innocence. (*People v. Snow* (2003) 30 Cal.4th 43, 66.)  But the relevant inquiry on appeal is whether, in light of all the evidence, "*any* reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt."  (*People v. Towler* (1982) 31 Cal.3d 105, 118.)

The central issue in this case was the identity of the shooter.  The evidence that appellant was the shooter was entirely circumstantial—but it was sufficiently substantial to uphold his convictions.

### 1. Motive

There was substantial evidence that appellant had motive to kill Luis in revenge for R.W.'s death. (*People v. Flores* (2020) 9 Cal.5th 371, 412 [motive to eliminate victim who was a witness to another murder and not loyal to the gang]; *People v. Pride* (1992) 3 Cal.4th 195, 245 (*Pride*) [defendant's work history supplied a possible motive for the killings]; *People v. Lewis* (1963) 217 Cal.App.2d 246, 259–260 [defendant had motive for seeking vengeance against murder victim].)

### 2. Opportunity

There was also substantial evidence indicating that appellant had the opportunity to commit the offenses. It is undisputed appellant's mother owned a 2005 model Acura TL sedan in September 2019. Bay Bridge surveillance video showed appellant driving an Acura on the westbound toll lane at 7:56 p.m. on September 8, 2019, about one hour before the shooting.

Before the shooting, surveillance video captured a vehicle bearing the same characteristics of the Acura driving back-and-forth in front of the moving van used by Luis and A.B., and later waiting on Naples Street until Luis drove away from the gas station; then following Luis to Athens Street where the shooting occurred at 9:06 p.m.

About 13 minutes after the shooting, a license plate reader and surveillance video captured appellant's mother's Acura traveling east on the Bay Bridge near Treasure Island. The time to drive to that location from the crime scene was approximately nine minutes. Based on this evidence, the court could reasonably infer that appellant was present at the scene when the shooting occurred. (*Pride*, *supra*, 3 Cal.4th at p. 245 [evidence establishing time of death, defendant's work schedule, the drive time from murder scene

18

to defendant's home supported reasonable inference that defendant was present at scene when murders occurred].)

### 3. *Firearms Evidence*

Twenty-one cartridge casings, all of which were 5.7-caliber, were recovered at the crime scene. The weapon used to discharge the rounds was an FN Five-Seven, a semiautomatic handgun with a 21-round capacity. The weapon was somewhat rare and had unique characteristics, including markings on the pistol grip and rear slide, a curved pistol grip, and side switches. The Instagram video posted 10 days after the shooting showed appellant touching what appeared to be an FN Five-Seven pistol in the rear passenger seat of a vehicle.

Based on this evidence, the court could reasonably infer that appellant had access to an FN Five-Seven pistol and that he used it to kill Luis and, in his attempt to kill A.B. (See *People v. Flores*, *supra*, 9 Cal.5th at p. 413 [rational jury could have logically concluded that ballistics evidence together with other evidence showed defendant murdered victim]; *Pride*, *supra*, 3 Cal.4th at p. 246 [jury could infer from distinctive appearance of probable murder weapon that it was defendant's knife and that it had not been stolen before the crimes].)

### 4. *Consciousness of Guilt*

At the time of the shooting, the Acura's grill was gray or silver in color and the wheel rims were silver or chrome. Ten days after the shooting, the Acura had dark-colored wheel rims. When the Acura was recovered 18 days after the shooting the wheel rims, grill, and front headlamp had been painted black.

Based on this evidence the court could find appellant engaged in post-crime conduct from which it could reasonably infer a consciousness of guilt.

19

(*People v. Thompson* (2010) 49 Cal.4th 79, 113 [attempts to conceal the crime by cleaning up the crime scene was highly probative of whether defendant committed the crime]; *Pride*, *supra*, 3 Cal.4th at p. 246 [defendant's post-crime behavior of placing a jumpsuit over his work clothes before arriving home and uncharacteristic laundering of the same clothes evidenced consciousness of guilt].)

     5.     *Physical Characteristics*

The video footage shows the shooter was average height, slim build, and fairly quick on their feet—indicative of someone young. By all accounts, appellant fit this description. A.B. testified appellant's eyes were consistent with the shooter's, which she described as a "unique eye shape." A.B. later described the shooter as a "light-skinned" Hispanic male. It is undisputed that appellant had a "mixed race" heritage and a "light comple[xion]." Based on the circumstantial evidence presented, the court could reasonably infer that appellant's physical appearance was consistent with the shooter's build.

In sum, we conclude the record contained substantial evidence to support the court's finding that appellant was the shooter. Appellant's arguments challenging the sufficiency of the evidence do not compel a contrary conclusion.

In challenging the sufficiency of the evidence, appellant argues: (1) the evidence was speculative that he was the shooter because all signs pointed to Vega as the shooter; (2) A.B.'s testimony was suspect, including her explanation for stopping on Athens Street; (3) the evidence of motive was weak; (4) there was no evidence the FN Five-Seven pistol in the Instagram video was the murder weapon or that he had dominion and control of the gun in the video; (5) the shooter's vehicle was unknown; (6) there was no direct evidence of his location at the time of the shooting; (7) the modification of the

Acura was consistent with an innocent explanation; and (8) his clothing did not match the clothing of the shooter described by the 911 caller.

By these arguments, appellant is confusing the role of the appellate court with that of the trier of fact. It is not the function of this court to reweigh the evidence. (*People v. Demond* (1976) 59 Cal.App.3d 574, 583 [lack of eyewitnesses or direct evidence of the manner in which victim's injuries were inflicted does not sustain a claim of insufficient evidence where ample circumstantial evidence connects defendant with the crime].) The weight accorded to evidence and the credibility of witnesses is within the sole province of the trier of fact. (*People v. Stewart* (2000) 77 Cal.App.4th 785, 790.) To the extent the trial court made contrary inferences from the evidence, those conclusions are binding in this court. (*People v. Teale* (1969) 70 Cal.2d 497, 505 [defendant's challenge to the sufficiency of evidence would have the reviewing court draw contrary inferences from the evidence, which the court may not do]; *People v. Hunt* (1985) 174 Cal.App.3d 95, 104 ["Where two conflicting inferences may be drawn from the evidence, it is the reviewing court's duty to adopt the one supporting the challenged order"].) Inferences that could have led the trier of fact to a different result do not, as a matter of law, undermine the substantial evidentiary support for the verdict. (*People v. Casares* (2016) 62 Cal.4th 808, 827 [rejecting claim of insufficient evidence based essentially on competing inferences defendant wished the jury had drawn], disapproved on other grounds by *People v. Dalton* (2019) 7 Cal.5th 166, 214.)

Accordingly, we conclude substantial evidence supports the court's implied finding that appellant was the shooter.

**B.** **_Premeditated Attempted Murder_**

Appellant contends there is no substantial evidence to support the finding that he committed premeditated attempted murder under a kill zone theory of liability. We first address the kill zone theory and then turn to whether appellant acted with premeditation and deliberation.

1. *Attempted Murder – Kill Zone*

Attempted murder requires the specific intent to kill, or express malice, and the commission of a direct but ineffectual act toward accomplishing the intended killing. (*People v. Superior Court* (*Decker*) (2007) 41 Cal.4th 1, 7; see also *People v. Mumin* (2023) 15 Cal.5th 176, 190 (*Mumin*).) "To be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else. The defendant's mental state must be examined as to each alleged attempted murder victim. Someone who intends to kill only one person and attempts unsuccessfully to do so, is guilty of the attempted murder of the intended victim, but not of others." (*People v. Bland* (2002) 28 Cal.4th 313, 328 (*Bland*).) "[A]lthough the intent to kill a primary target does not *transfer* to a survivor, the fact the person desires to kill a particular target does not preclude finding that the person also, concurrently, intended to kill others within what is termed the 'kill zone' " for attempted murder. (*Id*. at p. 329.)

*Bland* illustrated the kill zone theory with the following hypothetical: "[C]onsider a defendant who intends to kill A and, in order to ensure A's death, drives by a group consisting of A, B, and C, and attacks the group with automatic weapon fire or an explosive device devastating enough to kill everyone in the group. The defendant has intentionally created a 'kill zone' to ensure the death of his primary victim, and the trier of fact may reasonably infer from the method employed an intent to kill others

22

concurrent with the intent to kill the primary victim. When the defendant escalated his mode of attack from a single bullet aimed at A's head to a hail of bullets or an explosive device, the factfinder can infer that, whether or not the defendant succeeded in killing A, the defendant concurrently intended to kill everyone in A's immediate vicinity to ensure A's death." (*Bland, supra*, 28 Cal.4th at p. 330.)

In *People v. Canizales* (2019) 7 Cal.5th 591 (*Canizales*) our Supreme Court "reaffirmed *Bland*'s concurrent intent theory but articulated its contours and limitations" and "explained how the theory relates to proving the specific intent to kill required for attempted murder." (*Mumin, supra*, 15 Cal.5th at p. 192.) "*Bland*'s adoption of the kill zone theory meant that a prosecutor charging attempted murder in a multi-victim case had an additional, alternative ground by which to prove the requisite intent to kill. Under appropriate facts, the prosecutor could attempt to show either that the defendant's intent to kill one or more alleged victims arose independently of his actions toward any other victim, or that the defendant's intent to kill an untargeted victim arose concurrently with his intent to kill a primary target." (*Canizales*, at p. 603.) And it noted that "there are evidentiary bases, other than the kill zone theory, on which a fact finder can infer an intent to kill for purposes of attempted murder liability that do not depend on a showing that the defendant had a primary target . . . ." (*Id*. at p. 608.)

The *Canizales* court clarified "that a jury may convict a defendant under the kill zone theory only when the jury finds that: (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm – that is, an area in which the defendant intended to kill everyone present to ensure

23

the primary target's death – around the primary target[;] and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm. Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm." (*Canizales, supra*, 7 Cal.5th at pp. 596–597; see *id.* at p. 609 [" '[w]ithout a primary target, there cannot be concurrent intent because there is no primary intent to kill as to which the intent to kill others could be concurrent.' "].)

*Canizales* cautioned that "[t]rial courts should tread carefully when the prosecution proposes to rely on such a theory, and should provide an instruction to the jury only in those cases where the court concludes there is sufficient evidence to support a jury determination that the *only* reasonable inference from the circumstances of the offense is that a defendant intended to kill everyone in the zone of fatal harm. The use or attempted use of force that merely *endangered* everyone in the area is insufficient to support a kill zone instruction." (*Canizales, supra*, 7 Cal.5th at p. 608.)

Recently, in *Mumin*, the California Supreme Court clarified that " 'the only reasonable inference' caveat" in *Canizales* was used "to explain how the *jury* should evaluate circumstantial evidence relating to the defendant's intent. This discussion of the jury's role does not suggest a departure from the traditional substantial evidence standard in evaluating whether the *court* has properly instructed on a particular theory of conviction." (*Mumin, supra*, 15 Cal.5th at p. 201.)

Here, the evidence was sufficient to support the reasonable inference that Luis was the primary target. Appellant witnessed the stabbing that fatally wounded his brother R.W. and he identified Luis as the perpetrator. The shooting on September 8, 2019 occurred nearly five years to the date of

R.W.'s murder on September 2, 2014. (See *People v. Smith* (2005) 37 Cal.4th 733, 751 [evidence of motive can support intent to kill].)

Appellant created a zone of harm around Luis when he came up to the driver's side window and used a semiautomatic pistol to fire 21 rounds in rapid succession. A.B., who was sitting next to Luis in the front passenger seat, was in the direct line of fire and suffered a gunshot wound to her right arm. (See *Bland*, *supra*, 28 Cal.4th at pp. 318, 333 [approaching a car in which rival gang member was seated in driver's seat, opening fire with a .38-caliber handgun, shooting numerous rounds into the vehicle and as it drove away "virtually compelled" finding kill zone theory applied]; *Mumin*, *supra*, 15 Cal.5th at p. 204 [concurrent intent cases involving vehicle shootings have been described as employing a " 'flurry' " or " 'hail' " of bullets]; *People v. Dominguez* (2021) 66 Cal.App.5th 163, 187 [rapid firing of 21 shots into a small space enclosed on three sides supported kill zone theory]; *People v. Windfield* (2021) 59 Cal.App.5th 496, 517 [firing multiple bullets at close range against two people who were walking side by side supported kill zone theory].)

Contrary to appellant's contention, there is no requirement that a defendant be aware of who is in the zone of fatal harm to support a conviction for attempted murder based on a kill zone theory. (See *People v. Vang* (2001) 87 Cal.App.4th 554, 564 [rejecting defendants' argument that they could not be convicted of attempted murder as to someone they did not know was in the residence when they opened fire at the residence]; see also *People v. Adams* (2008) 169 Cal.App.4th 1009, 1023 ["[w]hether or not the defendant is aware that the attempted murder victims were within the zone of harm is not a defense, as long as the victims actually were within the zone of harm"].)

Appellant argues the evidence was insufficient to support the kill zone theory because: (1) there was no evidence of a "spray of bullets throughout the car"—the shooter fired solely at Luis; (2) due to the placement in the car, killing A.B. would not ensure the death of Luis; (3) the shooter was unaware of A.B.'s presence—thus A.B. shooting "was an unintended consequence of moving her arm in the line of fire;" and (4) there was no evidence A.B. was in the direct line of fire. While defense counsel could have certainly made these arguments to the trier of fact, they are not dispositive as to the sufficiency of the evidence to support a kill zone theory.

*People v. Booker* (2020) 58 Cal.App.5th 482 (*Booker*), is of no assistance to appellant. In that case, the defendants and the two victims had a brief encounter in a store. (*Id.* at p. 488.) Soon after the victims left in a car, defendants' car pulled alongside them, and the shooter fired three to seven shots at the victims' car, killing the driver but leaving the passenger uninjured. (*Id.* at pp. 488–489.) Citing to *Canizales*, the *Booker* court opined two of the factors to support the kill zone theory were present—the distance between the defendant and the alleged victims, and the closeness of the victim to the intended target. (*Id.* at pp. 500–501.) The court reasoned, however, the type and amount of force used did not support the kill zone theory. The court found it dispositive the "three to seven shots" from a non-semiautomatic or automatic weapon were "directed at the front driver's side" and "there were no bullet holes in the car's body or doors that would have reflected a spray of bullets." (*Id.* at p. 500.)

Here, unlike in *Booker*, appellant used a semiautomatic weapon to fire 21 shots. The spray of bullets from the semiautomatic weapon hit various parts of Luis's body, including his head, heart, chest, liver, and one of his kidneys. From this evidence it was reasonable to conclude appellant had a

26

primary target—Luis—and reasoned he could not miss that intended target if he killed everyone in the area in which the target was located. (*Canizales, supra*, 7 Cal.5th at p. 607 [determination does not turn on effectiveness or ineffectiveness of attack].)

The court could reasonably conclude that appellant intended to create a zone of fatal harm in the confined space of the front passenger compartment of Luis's car, a zone within which A.B. was located, and that he had the concurrent intent to kill anyone in that zone in order to ensure that Luis was killed. (*Canizales*, *supra*, 7 Cal.5th at pp. 609–610.)

2.      *Premeditation and Deliberation*

Appellant next contends there was insufficient evidence of premeditation and deliberation. Although we conclude there is substantial evidence of a specific intent to kill A.B. under a kill zone theory, we nevertheless find there is insufficient evidence that appellant acted with premeditation and deliberation.

For an attempted murder to be premeditated and deliberate "the intent to kill must have been formed upon a preexisting reflection and must have been the subject of actual deliberation and forethought." (*People v. Rowland* (1982) 134 Cal.App.3d 1, 7; see *People v. Herrera* (1999) 70 Cal.App.4th 1456, 1462–1463, fn. 8 ["We do not distinguish between attempted murder and completed first degree murder for purposes of determining whether there is sufficient evidence of premeditation and deliberation"], disapproved on another point in *People v. Mesa* (2012) 54 Cal.4th 191, 199.)

" ' "[P]remeditated" means "considered beforehand," and "deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." ' " (*People v. Felix* (2009) 172 Cal.App.4th 1618, 1626 (*Felix*).)

" ' "The true test is not the duration of time as much as it is the extent of reflection." ' " (*Ibid.*)

" ' "The process of premeditation and deliberation does not require any extended period of time." ' " (*People v. Young* (2005) 34 Cal.4th 1149, 1182.) There is no requisite minimum length of time between the prior reflection on killing a person and taking action to commit the killing. (*People v. Thomas* (1945) 25 Cal.2d 880, 900.) " 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . .' " (*People v. Perez* (1992) 2 Cal.4th 1117, 1127.)

"In examining whether the evidence is sufficient to show that a defendant premeditated, a reviewing court may consider a tripartite framework—(1) planning activity, (2) motive, and (3) manner of the killing or attempt—in determining whether such intent may be inferred from the trial record." (*Felix, supra,* 172 Cal.App.4th at p. 1626.) These categories are " 'descriptive, not normative,' " and "reflect the court's attempt 'to do no more than catalog common factors that had occurred in prior cases.' " (*People v. Young, supra,* 34 Cal.4th at p. 1183.) "The categories of evidence . . . do not represent an exhaustive list of evidence that could sustain a finding of premeditation and deliberation, and the reviewing court need not accord them any particular weight." (*Ibid.*) While these categories are helpful for review, they are not a sine qua non to finding first degree premeditated murder, nor are they exclusive. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1081.) "However, '[w]hen the record discloses evidence in all three categories, the verdict generally will be sustained.' " (*People v. Stitely* (2005) 35 Cal.4th 514, 543.)

In essence, the fundamental inquiry is whether "the crime occurred as a result of preexisting reflection rather than a rash or unconsidered impulse."

28

(*Felix, supra,* 172 Cal.App.4th at p. 1626.)  This is generally inferred from the circumstances of the crime.  (*People v. Ramos* (2004) 121 Cal.App.4th 1194, 1207–1208.)

Here, we cannot infer premeditation and deliberation from the record. There is no evidence that appellant had a motive to kill A.B. or that he specifically targeted her.  Indeed, there is little evidence suggesting appellant knew A.B. was in the car.  While this fact, as we have explained does not insulate appellant from kill zone liability (see *People v. Vang*, *supra*, 87 Cal.App.4th at p. 564), it nevertheless suggests that he did not act with premeditation and deliberation with respect to A.B.

We conclude there is insufficient evidence to support the conclusion that appellant's attempted murder of A.B. was premeditated and deliberate. Thus, the premeditation and deliberation finding must be reversed.

## C.    *Carrying a Concealed Firearm in a Vehicle*

Appellant argues no testimony or evidence was ever presented regarding the manner in which the gun was carried in the Acura on September 8, 2019.  We agree there is insufficient evidence to support the court's true finding on count VI, which charged appellant with carrying a concealed weapon within a vehicle.  (§ 25400, subd. (a)(1)).

Section 25400, provides in subdivision (a)(1) that a person is guilty of carrying a concealed firearm when he carries "concealed within any vehicle that is under the person's control . . . any pistol, revolver, or other firearm capable of being concealed upon the person."  (Italics added.)  No evidence supported a conclusion that appellant carried a gun concealed within a car he controlled on September 8, 2019.

A concealed weapon inside a car might be found underneath a floor mat (*People v. Jefferson* (2015) 238 Cal.App.4th 494, 499), hidden in the gap in a

split bench seat (*People v. Padilla* (2002) 98 Cal.App.4th 127, 132, 137), in an air vent under the dashboard (*People v. Redmond* (1966) 246 Cal.App.2d 852, 855), or in an unlocked container behind a seat (*People v. Hodges* (1999) 70 Cal.App.4th 1348, 1355.) Here there was no evidence of such concealment *inside* the car.

The People suggest video footage of appellant removing a firearm from his pocket as he got out of the car supports an inference that "appellant caused the firearm to be concealed within the Acura." We disagree. The mere fact that appellant got out of the car with a gun does not in any way suggest the manner in which he possessed the gun within the car. The cases cited by the People are distinguishable because they involved reasonable inferences based on circumstantial evidence. (See *People v. May* (1973) 33 Cal.App.3d 888, 890–891 [handgun visible to officer through defendant's open pocket was concealed weapon]; *People v. Watkins* (2012) 55 Cal.4th 999, 1024 [applying reasonable inference principle to acts of attempted robbery that were not seen by victims]; *People v. Story* (2009) 45 Cal.4th 1282, 1298 [finding reasonable inferences of rape and murder based on circumstantial evidence at scene and condition of victim].) Here, the inferences suggested by the People are purely speculative and do not constitute substantial evidence that appellant concealed the gun in the car.

Similarly lacking is the People's assertion that appellant's "clandestine activity" of parking against the flow of traffic, idling in the street, and making a "three-point turn" could reasonably support the inference that "he had concealed the firearm inside his vehicle to avoid detection from anyone whom he encountered . . . ." Although arguably suspicious, these activities do not support a reasonable inference that appellant had concealed the gun in the car.

With no evidence that appellant concealed the gun somewhere inside the car, we must reverse the court's true finding on count VI.

### IV. Two Penal Code Section 25850 Offenses

In counts IV and V, the delinquency petition alleged that on September 8, 2019, appellant carried a loaded firearm in public, both on his person (Pen. Code § 25850, subd. (a) [count IV]) and in a vehicle (*ibid*. [count V].)  The court found both allegations to be true.

Appellant contends, and the People concede, a true finding was appropriate on *either* count IV or V but *not both* because both counts were based on carrying the same firearm in public on the same date.  We agree. (*People v. Vidana* (2016) 1 Cal.5th 632, 650 [multiple convictions not permitted for different statements of same offense arising from same act or course of conduct]; *People v. Ramon* (2009) 175 Cal.App.4th 843, 857 [unlawful carrying of loaded weapon while a member of street gang and unlawfully carrying of loaded weapon for which one was not the registered owner did not define separate crimes; rather, they established penalty based on circumstances of offense and offender].)

Accordingly, the true finding on count V is hereby vacated.

### V. SYTF Commitment

Appellant raises three related arguments challenging his SYTF commitment: (1) the court abused its discretion in dismissing a non-qualifying offense for the purpose of making him eligible for SYTF commitment; (2) the court's findings setting forth the basis of the SYTF commitment are inadequate; and (3) substantial evidence does not support the SYTF commitment.

"[T]he juvenile court has long enjoyed great discretion in the disposition of juvenile matters . . . ." (*In re Greg F.* (2012) 55 Cal.4th 393, 411.)  It has

31

" 'maximum flexibility to craft suitable orders aimed at rehabilitating the particular ward before it.' " (*Ibid.*)  A juvenile court's commitment order may be reversed on appeal only upon a showing that the court abused its discretion.  (*In re Miguel C.* (2021) 69 Cal.App.5th 899, 908.)  " ' "[A] trial court abuses its discretion when the factual findings critical to its decision find no support in the evidence." ' "  (*In re Nicole H.* (2016) 244 Cal.App.4th 1150, 1154.)

## A.    *Dismissal of Non-Qualifying Offense*

A minor may not be committed to the Department of Corrections and Rehabilitation, Division of Juvenile Facilities, unless his or her most recent offense alleged in any petition and admitted or found true by the court is one described in Welfare and Institutions Code section 707, subdivision (b).  (Welf. & Inst. Code, § 733, subd. (c); *In re J.B.* (2022) 75 Cal.App.5th 410, 418.)  Appellant's most recent offense, firearm possession by a minor (count VIII), is not a listed offense.  (Welf. & Inst. Code, § 707, subd. (b); Pen. Code, § 29610.)  On the prosecution's motion, the court dismissed count VIII and later committed appellant to a SYTF.

Appellant contends the court was without authority to dismiss count VIII for the sole purpose of making him eligible for SYTF commitment.  He further contends the court failed to adequately provide its reasons for dismissing the non-qualifying offense.  As we explain, the court did not err dismissing the non-eligible offense.  However, a limited remand is required for the court to set forth its reasons in the record.

### 1.    *Additional Background*

As relevant here, the murder and attempted murder occurred on September 8, 2019 and the second gun possession occurred on September 25, 2019 (count VIII).  Following the multi-day, contested jurisdictional hearing,

the court found true the allegations in the delinquency petition on January 29, 2021. At the April 22, 2021 contested disposition hearing, the court committed appellant to the Division of Juvenile Justice (DJJ) for a maximum term of 83 years, four months. Appellant sought writ relief from this court on the grounds that his most recent offense—the September 25, 2019 gun possession—was not an enumerated offense, which made him ineligible for DJJ commitment. The People agreed the DJJ commitment was in error. We granted the unopposed petition and directed the court to vacate the DJJ commitment and remanded the matter for a new dispositional hearing.

On remand, after the court vacated the DJJ commitment, the prosecutor asked for the dismissal of count VIII—the September 25, 2019 gun possession allegation—which was the most recent offense alleged in the delinquency petition. At a September 14, 2021 hearing, the prosecutor argued it was "in the interest of justice and for the welfare of the now non-minor, to be committed to DJJ . . . [¶] Since the Court found true the lying in wait first degree and attempted murder and the allegations of discharging a firearm, the minor is subject to mandatory DJJ commitment. With the dismissal of the [non-]DJJ eligible charge, the remaining charges are eligible for DJJ commitment." The prosecutor added, "This scenario comports with the one imagined by the dissent and addressed by the majority in [*In re Greg F.* (2012) 55 Cal.4th [393] at [pages] 413 to 414]. Again, the Court has previously decided that the DJJ commitment is in the best interest of justice and welfare of the minor after a contested dispositional hearing." The prosecutor also asked the court to order the DJJ commitment nunc pro tunc to the original disposition date of April 22, 2021.

In denying the nunc pro tunc request, the court noted the prosecution "knew about this case and the charges for a long time." The court then

summarily granted the prosecution's motion, ruling, "The motion to dismiss is granted." The corresponding minute order reflects, "District attorney's oral motion to dismiss Count 8 of petition dated 9-27-19 pursuant to 782 W&I – granted."

    2.    *Analysis*

Juvenile courts have long had the authority to dismiss juvenile petitions in the interests of justice and in a minor's best interests. (Welf. & Inst. Code, § 782; *In re Greg F.*, *supra*, 55 Cal.4th at p. 400.) Recently, this discretion has been held to include the dismissal of a portion of a petition. (*In re J.P.* (2023) 94 Cal.App.5th 74, 77; see also *In re J.B.* (2022) 75 Cal.App.5th 410, 413 [dismissal of previously adjudicated petitions].)

The dispute centers around Welfare and Institutions Code section 733, which outlines the offenses that are eligible for DJJ commitment, and Welfare and Institutions Code section 782, which authorizes the juvenile court to dismiss a petition. Welfare and Institutions Code section 733, subdivision (c) provides, "A ward of the juvenile court who meets any condition described below shall not be committed to the [DJJ]: [¶] . . . [¶] (c) The ward has been or is adjudged a ward of the court pursuant to [Welfare and Institutions Code,] [s]ection 602, and the most recent offense alleged in any petition and admitted or found to be true by the court is not described in subdivision (b) of Section 707 [of the Welfare and Institutions Code] or subdivision (c) of Section 290.008 of the Penal Code." "[T]he language of [Welfare and Institutions Code] section 733[, subdivision] (c) is clear and lends itself to only one reasonable interpretation. The statute premises [DJJ] eligibility on the nature of '*the most recent offense* alleged in *any petition* and admitted or found to be true by the court.' [Citation.] Plainly, this language refers to the last offense that was adjudicated to have been committed by the

34

minor. A minor can be committed to [DJJ] only if this particular offense is listed in [Welfare and Institutions] section 707[, subdivision] (b) or Penal Code section 290.008[, subdivision] (c)." (*In re D.B.* (2014) 58 Cal.4th 941, 947.)

Welfare and Institutions Code section 782 provides, "A judge of the juvenile court in which a petition was filed . . . may dismiss the petition, or may set aside the findings and dismiss the petition, if the court finds that the interests of justice and the welfare of the person who is the subject of the petition require that dismissal, or if it finds that [he or she] is not in need of treatment or rehabilitation."

We review the juvenile court's dismissal of a petition under Welfare and Institutions Code section 782 for abuse of discretion. (See *Greg F.*, *supra*, 55 Cal.4th at p. 420 [dismissal "is appropriate . . . so long as the juvenile court, in its discretion, finds that the dismissal is required by the interests of justice and the welfare of the minor"].)

Our Supreme Court has recognized that Welfare and Institutions Code sections 733 and 782 are not "irreconcilably in conflict." (*Greg F.*, *supra*, 55 Cal.4th at p. 407.) In *Greg F.*, the court held the juvenile court retains discretion to commit a minor to DJJ by using its authority under Welfare and Institutions Code section 782 to dismiss the most recent sustained charge or petition which rendered him or her ineligible for such a commitment. Section 782 provides a discretionary tool for the juvenile court "to control the operative petition for purposes" of Welfare and Institutions Code section 733, subdivision (c) and, "consequently, expand its dispositional options." (*Greg F.*, at p. 408.) If the juvenile court exercises its discretion under Welfare and Institutions Code section 782 to dismiss a delinquency petition, "its decision

35

does not nullify or abrogate" Welfare and Institutions Code section 733, subdivision (c). (*Id.* at p. 408.)

Appellant contends *Greg F.* is "not a good fit" for his case because here the dismissal was "accomplished long after the dispositional hearing." He further asserts *Greg F.* is inapposite because it addressed DJJ commitments instead of SYTF commitments. Appellant's attempt to distinguish *Greg F.* fails. First, appellant's characterization of the record is somewhat disingenuous and ignores the procedural history of the case. In granting appellant's petition for mandate, we ordered the April 22, 2021 disposition order to be vacated. The prosecution's motion to dismiss count VIII occurred after the juvenile court vacated the original disposition and *before* the new disposition proceedings had occurred. Second, although there are differences in DJJ and SYTF commitments, nothing purports to limit the juvenile court's discretion under Welfare and Institutions Code section 782.

To support his case, appellant cites *In re A.O.* (2017) 18 Cal.App.5th 390, 392–393 (*A.O.*), which reversed the juvenile court's dismissal of an ineligible charge nearly three years after the disposition. However, *A.O.* limited its analysis to Welfare and Institutions Code section 733 because, in dismissing the non-eligible offense, the juvenile court "never purported to invoke" Welfare and Institutions Code section 782.[5] (*A.O.*, at p. 394.) The reviewing court assumed a juvenile court could have post-dispositional authority to dismiss for the sole purpose of securing a DJJ commitment. (*Id.* at p. 396.) But based on the "the sparse record," the court could not determine whether the juvenile court's dismissal of the disqualifying offense

---

[5] Similarly, in *In re D.B.*, *supra,* 58 Cal.4th at p. 945, cited by appellant the juvenile court did not consider (or even mention) Welfare and Institutions Code section 782.

was a proper exercise of discretion.  (*Id.* at pp. 396–397.)  The record of the underlying proceedings was not part of the record on appeal; thus the court had "no idea whether appellant made the admissions pursuant to a plea agreement, or whether any representations were made with regard to his possible placements."  (*Id.* at p. 396.)  Indeed, the *A.O.* court did not have "any record of the facts underlying the offense that purportedly qualifie[d] him for a DJ[J] commitment."  (*Ibid.*)

Equally unavailing is appellant's reliance on *In re Albert M.* (1992) 7 Cal.App.4th 353, 358–359, in which a juvenile court dismissed a petition, on a minor's request, without making any express or implied findings, but "merely noted that the matter had been continued many times, and that the minor had spent as much time in court as he would have spent in juvenile hall if 'convicted.' "  In reversing, the court explained the mere passage of time, without a showing of prejudice to the minor, was not a valid finding under Welfare and Institutions Code section 782.  (*Ibid.*)

Here, unlike in *A.O.*, our review is not hindered by a "sparse record."  Quite the contrary.  The instant appeal is one of five cases either previously considered by or pending before this court.  There is ample evidence regarding the underlying offenses and the evidence before the juvenile court.  The jurisdictional hearing spanned 14 days, with numerous witnesses and exhibits.  The court was well-versed with the specifics of appellant's case and had previously determined DJJ was an appropriate placement.

Unlike in *Alfred M.*, the record supports an implied finding that the dismissal was not granted merely due to the passage of time.  Rather, the prosecution, citing *Greg F.*, *supra*, 55 Cal.4th 393, made the motion on the grounds that it was in the best interest of justice and welfare of appellant,

which the juvenile court recognized when it ordered the initial DJJ commitment.

It is true that neither the prosecution nor the juvenile court expressly mentioned Welfare and Institutions Code section 782 at the hearing. And, the court did not provide its reasons for granting the dismissal at the hearing. However, at the time of the hearing, the juvenile court had no express obligation to state its reasons on the record.[6] (See former Welf. & Inst. Code, § 782, as amended by Stats. 2014, ch. 249, § 1.) Nevertheless, the court was obligated to provide a statement of its reasons in the minutes. (*Greg F., supra*, 55 Cal.4th at p. 413; Cal. Rules of Court, rule 5.790(a)(2)(A).) It did not do so. This requirement is mandatory, not directory. (*In re Juan C.* (1993) 20 Cal.App.4th 748, 753.) "Accordingly, the failure to comply with this requirement renders the dismissal 'without effect.' " (*A.O., supra*, 18 Cal.App.5th at p. 396.) We conclude the matter must be remanded for the limited purpose of allowing the court to correct this defect by setting forth its reasons in a written order entered upon the minutes. (See *People v. Bonnetta* (2009) 46 Cal.4th 143, 153 [providing for a limited remand in context of an analogous § 1385 dismissal]; *People v. Superior Court (Arthur R.)* (1988) 199 Cal.App.3d 494, 498, fn. 3 ["Although juvenile proceedings are not criminal . . . and not controlled in all respects by statutes and rules applicable to criminal proceedings and appeals, a general parallel has been acknowledged"].)

---

[6] Effective January 1, 2023, Assembly Bill No. 2629 (2021-2022 Reg. Sess.) amended Welfare and Institutions Code section 782, subdivision (b), to provide: "The reasons for a decision under this section shall be stated orally on the record. The court shall also set forth the reasons in an order entered upon the minutes if requested by either party or in any case in which the proceedings are not being recorded electronically or reported by a court reporter." (Welf. & Inst. Code, § 782, subd. (b).)

## B.    *Sufficiency of Findings Supporting SYTF Commitment*

Appellant next claims the court's findings are insufficient because the court failed to address any less restrictive alternatives and did not articulate its analytical process as to why such alternatives could not reasonably protect the state's interests.

In making the determination to commit a youth to a secure treatment facility, the juvenile court "shall consider all relevant and material evidence, including the recommendations of counsel, the probation department, and any other agency or individual designated by the court to advise on the appropriate disposition of the case.  The court shall additionally make its determination based on all of the following criteria: [¶] (A) The severity of the offense or offenses for which the ward has been most recently adjudicated, including the ward's role in the offense, the ward's behavior, and harm done to victims[;] [¶] (B) The ward's previous delinquent history, including the adequacy and success of previous attempts by the juvenile court to rehabilitate the ward[;] [¶] (C) Whether the programming, treatment, and education offered and provided in a secure youth treatment facility is appropriate to meet the treatment and security needs of the ward[;] [¶] (D) Whether the goals of rehabilitation and community safety can be met by assigning the ward to an alternative, less restrictive disposition that is available to the court[;] [¶] (E) The ward's age, developmental maturity, mental and emotional health, sexual orientation, gender identity and expression, and any disabilities or special needs affecting the safety or suitability of committing the ward to term of confinement in a secure youth treatment facility."  (Welf. & Inst. Code, § 875, subds. (a)(3)(A)–(a)(3)(E).)

Appellant argues the court committed him to SYTF without discussing any of the factors except B, noting he had no prior delinquent history.  As to

the other factors, he contends the court "merely recited the statutory language." In rendering its decision, the court stated, "The Court finds that a less-restrictive alternative disposition is unsuitable. The youth is committed to the secure youth treatment facility." Appellant argues the court's "perfunctory recitation did not meet the requirements for evaluating the criteria, thwarted the purpose of the legislation, and its finding was unsupported by the record." We disagree.

"[T]here is no rule that [a SYTF] placement cannot be ordered unless less restrictive placements have been attempted, and there is no requirement that the juvenile court expressly state on the record the reasons for rejecting less restrictive placements." (*In re Nicole H., supra,* 244 Cal.App.4th at p. 1159.)

Nothing in Welfare and Institutions Code section 875, subdivision (a)(3) requires a court to include a statement of reasons in support of a finding of the unsuitability of a less restrictive alternative disposition. Rather, the statute merely states the additional five criteria that a juvenile court must consider in making its determination. When a requirement for a statement of reasons exists, the Legislature knows how to include such a provision in a statute. For example, in amending Welfare and Institutions Code section 782, the Legislature added subdivision (b), which states in relevant part, "The reasons for a decision under this section shall be stated orally on the record." Similarly, Welfare and Institutions Code section 707, the statute governing fitness hearings, provides, "If the court orders a transfer of jurisdiction, the court shall recite the basis for its decision in an order entered upon the minutes, which shall include the reasons supporting the court's finding that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (*Id.* at subd. (a)(3).)

40

"When the Legislature uses materially different language in statutory provisions addressing the same subject or related subjects, the normal inference is that the Legislature intended a difference in meaning." (*People v. Trevino* (2001) 26 Cal.4th 237, 242; *In re A.E.* (2019) 38 Cal.App.5th 1124, 1146 [same].) Accordingly, there is no merit to appellant's assertion that Welfare and Institutions Code section 875 requires a statement of reasons on the record. (See, e.g., *In re A.L.* (2022) 73 Cal.App.5th 1131, 1156 [juvenile court not statutorily required to recite specific findings when it concludes at permanency-planning stage of dependency proceedings that termination of parental rights would not be detrimental].)

## C. *Sufficiency of Evidence Supporting SYTF Commitment*

Finally, appellant claims the record does not support the juvenile court's conclusion that there was no less restrictive alternative available.[7] He contends his rehabilitative needs could have been met in the community due to his low risk of reoffending, and the court improperly relied upon the nature of the crime to justify the placement.

### 1. *Additional Background*

Before issuing its commitment order, the court considered the following evidence:

### i. Probation Department's Addendum Report

On October 13, 2021, probation filed an Addendum Dispositional Report and Recommendation, providing the following information: Although appellant's achievements were "stellar" and he had a "very supportive extended family, a family of working professionals," probation recommended he be committed to the Juvenile Justice Center (JJC). JJC was "the only

---

[7] Appellant does not challenge the juvenile court's finding that SYTF commitment would provide a probable benefit to him.

appropriate secure setting program available" and that a secure option was appropriate "based on the severity of the charges and ensures [appellant's] safety, while allowing him access and engage[ment] in rehabilitative services in an effort to become a successful and productive member of society."

Additionally, examination of "the family history has shown severe psychological trauma. [Appellant's] older brother, [R.W.], was stabbed to death in 2014, the crime was witnessed by [appellant] and his younger brother. The deceased victim in the current case is believed to have been at the scene of [R.W.'s] stabbing. . . There are no records of [appellant] or any of his family members engaging in grief counseling/therapeutic support or requesting support from any community-based organizations to address the death in the family and cope with this enormous loss." This evidence supported the conclusion in the report that appellant "must complete an intensive rehabilitation program in a secure setting prior to release."

The probation department had "considered all available dispositional options taking into consideration [appellant's] safety, the safety of the community, and the seriousness of the crime. [Appellant's] safety is a concern as retaliation would most likely be imminent—which means that any local placement would not be safe for him." The "[f]amily members offered to relocate to provide a Resource Family Approval . . . placement [outside of California]," but the probation department believed appellant "must complete an intensive rehabilitation program in a secure setting prior to release." Appellant "did not meet the criteria for placement in a California [short-term residential therapeutic program] . . . as he is 19 years old with a High School Diploma and due to the seriousness of the offense." Additionally, commitment to an out-of-state facility was "not possible due to the recent decertification of out-of-state placements." Also, there was "no viable ranch

42

type facility, and a non-secure setting would not be an appropriate recommendation[.]"

### ii. Appellant's Addendum Report

On November 23, 2021, appellant filed an Addendum Dispositional Report, attaching an assessment and report from the Center for Juvenile and Criminal Justice (CJCJ) recommending he be permitted to relocate and attend college as discussed in the report, and a report about trauma resulting from juvenile incarceration. On November 30, 2021, appellant filed a report of a psychological evaluation, indicating he had a low risk to reoffend.

### iii. Dispositional Hearing

At the dispositional hearing on December 1, 2021, appellant's probation officer Tony Hurley recommended that appellant be committed to juvenile hall. He had considered a DJJ commitment, but it was no longer an option due to the change in the Juvenile Court Law. Although appellant had made "[e]xcellent" progress, Hurley recommended he remain in juvenile hall because "he need[ed] to be held accountable for his actions and continue with services."

Dr. Rami Mogannam, Ph.D., a licensed clinical psychologist, testified as an expert for the defense. Dr. Mogannam conducted a psychological evaluation of appellant and diagnosed him with post-traumatic stress disorder (PTSD). Appellant had mitigated his PTSD through his own efforts, and to some degree through treatment. Dr. Mogannam opined that appellant presented a low risk to public safety.

Malik Wade and Laura McDonnell were facilitators of Next Steps Liaison Project, a youth advocacy program that promoted emotional literacy inside JJC. Wade began working with appellant since he had been in juvenile hall; Wade had contact with appellant on a weekly basis. Every

43

week, appellant seemed to have attained a new level of growth and maturity. Appellant "never cease[d] to amaze" Wade in terms of his ability to understand the seriousness of his predicament. Although Wade and appellant never discussed the specifics of the underlying crimes, Wade did not believe he was a threat to society. Appellant was "very smart" and was also "very goal oriented" in terms of reuniting with his family. Wade did not believe appellant would engage in criminal conduct if released.

McDonnell described appellant as "settling into some maturity, thinking about the long term of his life." He was very committed to his college classes, which really kept him focused. McDonnell believed appellant would be able to continue his focus if released; she had no reason to believe he would pose any threat to society.

Carlos Morales, appellant's uncle and a college faculty member, testified about the family plan where appellant would go to a safe location to continue his education and rehabilitation by enrolling in a university and obtaining appropriate therapy. Morales would supervise and support appellant. Speaking as an educator, Morales said that the conditions in juvenile hall, such as lack of access to computer time, resources, and instructors, had been limiting, and appellant had not had the appropriate time to enroll full-time in college, which kept him from performing at his peak.

Madelin Orr worked for CJCJ. Orr had filed two reports regarding the CJCJ's plan for appellant to relocate to a safe, non-secure location; the service providers for the plan were ready to work with appellant immediately.

The court then heard argument from counsel. Defense counsel began by stating appellant was the most extraordinary person he had encountered

in the juvenile justice system in decades of practice - "a young person who is so well socialized, has got so much family support, who has achieved such great accomplishments." He acknowledged the seriousness of the offense, but also noted that there was no prior criminal history. He argued treatment was available in the community, and appellant's maturity and low risk level showed that the less restrictive placement option was suitable.

The prosecutor asked for the court to follow probation's recommendation and keep appellant in JCC. He argued the plan proposed by the defense was "wholly inadequate" for appellant's wellbeing because it lacked safety measures, was not in a locked facility, and offered "no confidence of success." He concluded that, "It is not an appropriate disposition for the gravity of his conduct, his situation, his safety, and his growth."

### 2. *Analysis*

As discussed, in the context of SYTF commitments, courts are instructed to consider the following criteria: "(A) The severity of the offense or offenses for which the ward has been most recently adjudicated, including the ward's role in the offense, the ward's behavior, and harm done to victims. [¶] (B) The ward's previous delinquent history, including the adequacy and success of previous attempts by the juvenile court to rehabilitate the ward. [¶] (C) Whether the programming, treatment, and education offered and provided in a secure youth treatment facility is appropriate to meet the treatment and security needs of the ward. [¶] (D) Whether the goals of rehabilitation and community safety can be met by assigning the ward to an alternative, less restrictive disposition that is available to the court. [¶] (E) The ward's age, developmental maturity, mental and emotional health, sexual orientation, gender identity and expression, and any disabilities or

45

special needs affecting the safety or suitability of committing the ward to a term of confinement in a secure youth treatment facility." (Welf. & Inst. Code, § 875, subd. (a)(3)(A)–(E).)

Appellant asserts "[t]he circumstances indicate that the SYTF commitment order was based on the seriousness of the offense since all other factors were in appellant's favor," and "the Legislature has specified that the seriousness of the offense is only a single factor," and argues that his continued incarceration serves "an overwhelmingly punitive purpose in violation of the Juvenile Court law." In support of this position, appellant seeks to discredit the probation department's reports. He further contends that in light of his low risk of reoffending, combined with his stellar academic and personal achievements, plus an extremely supportive family, placement in the community was a suitable less restrictive means.

Conflicting evidence does not render a juvenile court's commitment order an abuse of discretion or warrant its reversal; the evidence may not be reweighed on appeal. (*In re N.C.* (2019) 39 Cal.App.5th 81, 87–88.) In making a placement determination, a juvenile court need not follow any particular order in its placement of a juvenile, i.e., from least to most restrictive, and a juvenile court does not necessarily abuse its discretion by committing a youth to a secure facility before other options have been exhausted. (See *John L. v. Superior Court* (2004) 33 Cal.4th 158, 184–185, fn. 10.) So long as a court concludes that alternative placements would be ineffective, a court need not try other placements prior to ordering commitment to a secure facility. (See *In re Ricky H.* (1981) 30 Cal.3d 176, 183; *In re M.S.* (2009) 174 Cal.App.4th 1241, 1250.) When " 'there is evidence in the record to show a consideration of less restrictive placements was before the court, the fact the judge does not state on the record his consideration of

those alternatives and reasons for rejecting them will not result in a reversal.' [Citation.] On the other hand, 'there must be some evidence to support the judge's implied determination that he sub silentio considered and rejected reasonable alternative dispositions.' " (*In re Nicole H.*, *supra*, 244 Cal.App.4th at p. 1159.)

The record makes clear that the considerations of less restrictive placements was before the court. The disposition report stated that a local placement would not be safe for appellant as "retaliation would most likely be imminent," that family relocation outside of California was not available until appellant completed "an intensive rehabilitation program in a secure setting prior to release," that placement in a short-term residential therapeutic program was not appropriate because appellant was then "19 years old with a High School Diploma and due to the seriousness of the offense," that an out-of-state facility was "not possible due to the recent decertification of out-of-state placements," and there was "no viable ranch type facility, and a non-secure setting would not be an appropriate recommendation." Defense counsel argued at length in favor of a treatment program in the community as being a less restrictive placement.

The record contains evidence supporting an implied determination that less restrictive alternatives would have been inappropriate, based, for example, on the "severity of the offense" (Welf. & Inst. Code, § 875, subd. (a)(3)(A))—appellant used a semiautomatic firearm to fire 21 shots into the passenger compartment of a vehicle, killing one occupant and injuring another—as well as the "security needs of the ward" (*Id.* at subd. (a)(C))—as noted by probation retaliation would be "imminent"—as well as "[w]hether the goals of rehabilitation and community safety can be met by assigning the ward to an alternative, less restrictive disposition" (*Id.* subd. (a)(3)(D))—

47

probation believed appellant "must complete an intensive rehabilitation program in a secure setting prior to release."

That appellant presented contrary evidence does not alter our conclusion. Rather, indulging all reasonable inferences to support the juvenile court's decision" (*In re Angela M.* (2003) 111 Cal.App.4th 1392, 1396), we find substantial evidence supports the juvenile court's finding of the inappropriateness or ineffectiveness of the less restrictive alternatives. Accordingly, the court did not abuse its discretion in ordering the SYTF commitment.

## VI. Custody Credits

Appellant contends the court erred by applying his custody credits to his theoretical maximum exposure instead of the actual physical custodial term.

He relies on our decision in *In re Ernesto L.* (2022) 81 Cal.App.5th 31, 40–43 (*Ernesto L.*), which held that in a DJJ commitment a minor's precommitment credits should be applied against a ward's actual maximum custodial term imposed under Welfare and Institutions Code section 731, subdivision (b) rather than against the theoretical maximum calculated under Welfare and Institutions Code section 726, subdivision (d).

While we understand the parallel appellant seeks to draw between commitments to an SYTF under Welfare and Institutions Code section 875 and commitments to the DJJ under Welfare and Institutions Code section 731, the applicable statutes differ.

In *Ernesto L.*, we held when a minor is committed to the DJJ, the juvenile court must apply any precommitment custody credits against the maximum custodial term under Welfare and Institutions Code section 731

48

rather than against the maximum exposure term of confinement set under section 726. (*Ernesto L., supra*, 81 Cal.App.5th at p. 34.)

Appellant argues because SYTF commitments have now replaced DJJ commitments, we should apply the reasoning of *Ernesto L.* and apply the credits to the baseline term set under Welfare and Institutions Code section 875, subdivision (b). While appellant's argument has some facial appeal, we are not persuaded that our reasoning in *Ernesto L.* should extend to confinements under Welfare and Institutions Code section 875.

Welfare and Institutions Code section 875, subdivision (b) provides that the juvenile court "shall set a baseline term of confinement," which "shall represent the time in custody necessary to meet the developmental and treatment needs of the ward and to prepare the ward for discharge to a period of probation supervision in the community." The "baseline term of confinement" concept did not exist prior to the enactment of Welfare and Institutions Code section 875 as part of the realignment of wards from the now-closed DJJ to county-based custody. (Legis. Counsel's Dig., Sen. Bill No. 92 (2021-2022 Reg. Sess.) Previously, when a ward was committed to the DJJ, in addition to the maximum term of confinement required by Welfare and Institutions Code section 726, the court was required to "set a maximum term based upon the facts and circumstances of the matter or matters that brought or continued the ward under the jurisdiction of the court and as deemed appropriate to achieve rehabilitation." (Welf. & Inst. Code, § 731, subd. (b).) Welfare and Institutions Code section 731 thus "permit[ted] the juvenile court in its discretion to impose either the equivalent of the 'maximum period of imprisonment that could be imposed upon an adult convicted of the offense or offenses' committed by the juvenile [Welf. & Inst. Code] (§ 731, subd. (c)) or some lesser period based on the 'facts and

49

circumstances of the matter or matters that brought or continued' the juvenile under the court's jurisdiction." (*In re Julian R.* (2009) 47 Cal.4th 487, 498.)

The baseline term is meant to "represent the time in custody necessary to meet the developmental and treatment needs of the ward and to prepare the ward for discharge to a period of probation supervision in the community." (Welf. & Inst. Code, § 875, subd. (b)(1).) It is subject to change at regular intervals, depending on the ward's progress: The court is required to hold a "progress review hearing for the ward not less frequently than once every six months" and, at each hearing, the court must "evaluate the ward's progress in relation to the rehabilitation plan" and "determine whether the baseline term of confinement is to be modified." (*Id.* at subd. (e)(1)A).) The court, at each hearing, has discretion to order that the ward "remain in custody for the remainder of the baseline term" or that the baseline term be reduced by a period "not to exceed six months for each review hearing." (*Ibid.*) At the conclusion of the baseline confinement term, the court must discharge the ward to a period of probation supervision in the community unless the court finds that the ward "constitutes a substantial risk of imminent harm to others in the community if released from custody." (*Id.* at subd. (e)(3).) If the court so finds, it may order that the ward remain in custody for "up to one additional year of confinement, subject to the review hearing and probation discharge hearing provisions of this subdivision and subject to the maximum confinement provisions of subdivision (c)." (*Ibid.*)

It is evident that the baseline term is a modifiable period intended to reflect the minor's treatment needs and rehabilitative progress on an ongoing basis. Welfare and Institutions Code section 875 calls for the court to determine the initial baseline term based on the ward's most serious offense

and time deemed necessary for treatment and rehabilitation, and then to regularly evaluate the ward's progress and shorten the baseline term if warranted by that progress. Applying precommitment custody credits—which have nothing to do with a ward's rehabilitative progress—to the baseline confinement term would upset the legislatively crafted process of tailoring the baseline confinement term of confinement to the ward's "developmental and treatment needs" and preparation for discharge from custody.

We find the baseline term is not equivalent to the maximum custodial term set under Welfare and Institutions Code section 731 that we addressed in *Ernesto L.* Thus, we decline to extend *Ernesto L.* to baseline terms for SYTF commitments, which are governed by Welfare and Institutions Code section 875 and may be adjusted downward as soon as six months from the disposition order.[8]

In sum, the juvenile court did not err by applying appellant's custody credits against his maximum period of confinement.

## VII. Restitution

Appellant argues, and the People concede, the court erroneously imposed a $10 restitution administrative fee for each felony. We agree.

At the disposition hearing on December 29, 2021, the court ordered appellant "to pay [a] state restitution fine of each felony of $100, $10 administrative fee—and an administration fee of $10 per felony." The restitution fine and administrative fees do not appear on the written

---

[8] As the People correctly note, Welfare and Institutions Code section 875 was amended in 2022 to specifically state that "[p]recommitment credits for time served must be applied against the maximum term of confinement as set pursuant to this subdivision." (Welf. & Inst. Code, § 875, subd. (c)(1)(C), amended by Stats. 2022, ch. 58, § 41.)

disposition order. As best we can tell, it appears the court ordered a $100 restitution fine and a discretionary $10 fee per felony multiplied by seven felonies for an additional amount of $70.

Pursuant to Welfare and Institutions Code section 730.6, subdivision (b), "[i]f a minor is found to be a person described in Section 602, the court shall impose a separate and additional restitution fine." The fine is set commensurate with the seriousness of the offense and, for felony offenses, the fine shall not be less than one hundred dollars ($100) and not more than one thousand dollars ($1,000). (*Id.*, subd. (b)(1).) Beyond the statutory minimums, Welfare and Institutions Code section 730.6 provides for discretionary administrative costs in collecting the restitution fine. (*Id.*, subd. (q).) Specifically, subdivision (q) provides: "At its discretion, the board of supervisors of any county may impose a fee to cover the actual administrative cost of collecting the restitution fine, not to exceed 10 percent of the amount ordered to be paid, to be added to the restitution fine and included in the order of the court, the proceeds of which shall be deposited in the general fund of the county."

Appellant does not challenge the imposition of the statutory minimum restitution fine pursuant to subdivision (b)(2) of Welfare and Institutions Code section 730.6. Rather, he argues the administrative costs were statutorily unauthorized in light of a City and County of San Francisco ordinance that abolished such fees in 2018. (San Francisco Ord. No. 131-18. § 2, eff. July 1, 2018.)[9] San Francisco Ordinance No. 131-18 eliminated section 8.36 of the San Francisco Municipal Code, which previously authorized the Juvenile Probation Department "to collect a fee to cover the

---

[9] We granted appellant's request to take judicial notice of San Francisco Ordinance No. 131-18.

actual administrative cost of collecting any victim restitution fine included in an order of the court pursuant to Welfare and Institutions Code section 730.6." (San Francisco Ord. No. 131-18, § 2, at p. 5.)

Based on the deletion of section 8.36 from the San Francisco Administration Code in 2018, the trial court no longer had authority to impose the discretionary collection fees set forth in subdivision (q) of Welfare and Institutions Code section 730.6. As noted, however, neither these fees nor the statutory minimum restitution fine were included in the written disposition order. The oral rendition of judgment controls over any discrepancy with the ministerial minutes. (*People v. Delgado* (2008) 43 Cal.4th 1059, 1070; *People v. Mitchell* (2001) 26 Cal.4th 181, 185; *People v. Sharret* (2011) 191 Cal.App.4th 859, 864.) The written disposition order must be modified to reflect the disposition orally imposed by the court, which included a mandatory $100 restitution fine. (*People v. Gabriel* (2010) 189 Cal.App.4th 1070, 1073.)

## DISPOSITION

The jurisdictional and dispositional findings and orders as they pertain to counts I, III, IV, and VII are affirmed.

With respect to count II, the jurisdictional and dispositional findings are affirmed, but the premeditation and deliberation finding as to count II is vacated.

The jurisdictional and dispositional findings and orders as they pertain to counts V and VI are vacated.

The restitution collection fines ordered by the juvenile court are vacated.

The matter is remanded for the juvenile court to provide a revised dispositional order: (1) adding the $100 required restitution fine; and (2)

stating its reasons for dismissing count VIII.

The order committing J.W. to a SYTF is affirmed.

Upon completion of the actions hereby directed the juvenile court shall amend its records as may be appropriate and prepare, file and serve a new corrected order of commitment.

LANGHORNE WILSON, J.

WE CONCUR:

HUMES, P. J.

CASTRO, J.*

A164366N

---

* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.